H. C. BOONE, ET AL.

V.

C. ARTHUR WEAVER COMPANY, INCORPORATED

Record No. 850317

March 4, 1988

Present: All the Justices

*John H. Herbig (Allan M. Heyward, Jr.,* on briefs), for appellant.
*Keith D. Boyette (Hirschler, Fleischer, Weinberg, Cox & Allen,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

The dispositive question in this appeal concerns the time when the statute of limitations begins to run on a claim for damages caused by negligence in the furnishing of accountancy and tax services.

C. Arthur Weaver Company, Incorporated (Weaver), was a general supply company doing business in Virginia. Dalton, Pennell & Company (DP), was a partnership composed of H.C. Boone and others, engaged in the practice of accountancy. DP had performed tax and accounting services for Weaver since 1961.

In late 1975, Weaver began negotiations to acquire Parker-Nimmo Supply Company (Parker), a firm in Salem, Virginia, engaged in a business similar to Weaver's. Weaver's treasurer requested H. Addison Dalton, a partner in DP, to assist Weaver in minimizing the tax consequences of the Parker acquisition. DP agreed to provide the requested assistance and worked with

Weaver to develop a proposal for acquisition which was transmitted to Parker in January 1976.

DP recommended that Parker be liquidated at the time of acquisition by Weaver, and advised Weaver that the transaction would be tax free. Weaver acquired the Parker stock effective March 31, 1976, liquidated Parker immediately, and caused Parker to be formally dissolved on July 30, 1976. DP assisted in all aspects of the transaction, prepared Parker's final tax returns, and prepared Weaver's 1976 federal and state tax returns, which were filed in March and April 1977, respectively.

In September 1977, another accountant informed Weaver that DP may have erred in structuring the acquisition and in preparing Weaver's 1976 tax returns, exposing Weaver to additional taxes and penalties for unreported income. These consequences could have been avoided if DP had advised Weaver either to operate Parker as a subsidiary for more than two years before liquidating Parker, or alternatively, to merge the two companies and continue them in business under Weaver's name.

Initially, DP took the position that its advice had been correct. In December 1977, however, DP admitted that it had erred and recommended that Weaver file amended tax returns. Weaver authorized the preparation of amended returns, but informed DP that it would be held responsible for any additional taxes Weaver might be required to pay.

In early 1978, one of DP's partners advised Weaver that the issue fell into a "gray area," and that the answer was uncertain. He advised Weaver to request a "blind letter" ruling from the Internal Revenue Service, whereby an informal ruling could be obtained without disclosing the taxpayer's identity.* DP suspended its work on the amended returns, and none were filed.

No "blind letter" ruling was in fact requested. In the fall of 1978, DP told Weaver that no ruling could be had from the IRS and continued to take the position that the issue fell into a "gray area" of tax law. DP suggested that it "would not be subject to any real discomfort" if Weaver failed to amend its 1976 returns and merely waited to see what position the IRS would take.

In July 1979, the IRS notified Weaver that its 1977 tax return had been selected for a random audit. The IRS later expanded its

---

* The parties agree that a "blind letter" ruling would not have been obtainable in this case because that procedure is available only to prospective transactions, not those which have been consummated.

audit to include Weaver's returns for 1976 and 1978. DP represented Weaver throughout the audit proceedings and prepared a defense asserting that the Parker transaction had been correctly handled. The audit was completed in August 1980, and DP performed no services for Weaver thereafter. On September 15, 1980, Weaver received a federal notice of assessment of additional taxes, interest, and penalties arising from the Parker transaction. Weaver received a similar state notice of assessment on November 26, 1980. Weaver paid the additional taxes and brought this action against the DP partners on June 24, 1981, alleging that it had suffered damages resulting from DP's negligence. Weaver sought recovery of the additional taxes, penalties, and interest paid in 1980.

DP interposed a special plea of the statute of limitations and moved for summary judgment on that basis. The parties submitted the issue on stipulated facts. On December 13, 1984, the court, Judge Melvin R. Hughes, Jr. presiding, issued a letter opinion denying DP's motion for summary judgment. The court ruled that the accounting and tax services rendered by DP constituted a continuing undertaking which did not terminate until August 1980, when the statute of limitations began to run; that the applicable limitation period was either the three-year or five-year period applicable to actions on breach of contract prescribed by former Code § 8-13; and that the action was, therefore, timely brought under either limitation.

The case went to a bench trial, Judge Marvin F. Cole presiding, in December 1984. Weaver recovered final judgment, and we granted DP an appeal. DP admits its negligence and only the limitation question is before us.

DP argues that the three-year statute of limitations, applicable to oral contracts, governs the case; that DP contracted to perform several discrete undertakings, rather than one continuing undertaking; and that Weaver's right of action accrued, and the statute of limitations began to run, in 1976 when DP's breach of duty occurred. Thus, says DP, Weaver's right of action was barred in 1979 and this action was not brought until 1981.

Weaver replies that the trial court's ruling was correct on three alternative grounds: (1) the "continuing-undertaking" theory adopted by the court was correct; under that theory the statute did not begin to run until 1980; (2) even if the *cause* of action arose when the breach of duty occurred in 1976, no *right* of action

accrued until Weaver suffered harm as a result of the breach; no harm was suffered until the IRS, in 1980, assessed additional taxes against Weaver and, therefore, the statute of limitations did not begin to run until then; and (3) even if the *right* of action accrued when DP breached its duty, that breach did not become final and irrevocable until Weaver filed the dissolution papers for Parker in July 1976; the five-year limitation applicable to written contracts applies because certain written memoranda exchanged between the parties constitute a written contract; and this action was brought in June 1981, within five years after the breach.

 Because we find the trial court's ruling to be correct, it is unnecessary to examine Weaver's second and third alternative theories. We held in *Oleyar v. Kerr*, 217 Va. 88, 225 S.E.2d 398 (1976), that the contract statute of limitations applies to an action to recover for the professional negligence of an attorney, despite the fact that the motion for judgment was framed in tort. *Id.* at 90, 225 S.E.2d at 400. That result follows from the distinction between duties assumed pursuant to an agreement and duties imposed by general law. Because there would be no duty from the attorney to the client in the absence of a contract, the contract statute of limitations applied to the client's action for negligence. *Id.* at 90, 225 S.E.2d at 399; *see also Virginia Military Institute v. King*, 217 Va. 751, 758-59, 232 S.E.2d 895, 899, 900 (1977) (contract statute applies to action for negligence against architect).

 The logic of those cases applies with equal force to a contract for professional services between an accountant and his client, and we therefore affirm the trial court's ruling that the case is governed by either the three-year or the five-year limitation applicable to breaches of oral or written contracts, respectively. *See* former Code § 8-13 (1957 Repl. Vol.); *see also* present Code §§ 8.01-246(2) and (4) (1984 Repl. Vol.). Under the view we take of the case, it is unnecessary to review the evidence concerning whether the contract was oral or written in order to determine which of those limitations governs, because the action is timely in either event.

DP's principal contention is that its erroneous advice was given in January 1976 and acted upon by Weaver in March of that year. DP argues that its engagement "was complete upon consummation of the acquisition in reliance upon the advice given." DP says that no continuation of services was required beyond that

point. The preparation of tax returns, DP contends, was an entirely separate and discrete undertaking, which was complete upon the filing of the returns. DP draws an analogy to *VMI* v. *King*, where we held that an architect's undertakings to prepare plans and to supervise construction were separate and discrete, rather than a single continuing undertaking. 217 Va. at 759, 232 S.E.2d at 900. DP argues that after the liquidation of Parker, "all the king's horses and all the king's men" could not have averted the tax consequences to Weaver. Thus, says DP, Weaver's right of action accrued, and the statute of limitations began to run, in March 1976.

In *Keller* v. *Denny*, 232 Va. 512, 352 S.E.2d 327 (1987), decided after entry of the judgment in this case, we considered a similar argument in the attorney-client context. There, an attorney gave allegedly erroneous advice which culminated in damage to the client's interests at a later time. The attorney rendered continuing, or recurring, professional services to the client over a period of time, some of which involved consultations concerning the most advantageous course of action to take to avert the anticipated damage. The client urged us to adopt the "continuing agency" rule, whereby the right of action would accrue, and the statute of limitations would begin to run, only at the end of the professional relationship between the parties. The attorney urged us to apply *VMI* v. *King*, and to hold that the statute began to run when the negligent advice was given. Taking neither of those courses, we applied an analogy to the "continuing-treatment" rule we had developed in medical malpractice cases, as expressed in *Farley* v. *Goode*, 219 Va. 969, 252 S.E.2d 594 (1979). We held, in *Keller*;

> when malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated, notwithstanding the continuation of a general attorney-client relationship, and irrespective of the attorney's work on other undertakings or transactions for the same client.

232 Va. at 518, 352 S.E.2d at 330.

■ The reasons expressed in *Farley* for the application of the foregoing rule to the relationship of physician and patient, and in *Keller* for its application to the relationship of attorney and client, apply with equal force to the relationship of accountant and client. Further, the factual parallel between this case and *Keller* is strong. Here, as in *Keller*, the defendants gave continuing or recurring attention to the matter in question over a period of time. During that time, the client relied on the defendants' advice and on the defendants' efforts to extricate the client, or to avert or minimize the damage. The defendants' remedial services, while not requested or anticipated at the beginning of the undertaking, were all related to the original matter for which the defendants' services had been engaged. The undertaking occurred within a larger professional relationship wherein the defendants rendered other services to the client.

Because DP was engaged in the defense of Weaver throughout the course of the audit proceedings, which terminated in August 1980, the particular undertaking which forms the basis of this action did not end until that month and only then did the statute of limitations begin to run.

Accordingly, the judgment will be

*Affirmed.*