COURT OF APPEALS OF VIRGINIA


Present: Judges Haley, Millette and Senior Judge Coleman


DAWN BRANCH

                                             MEMORANDUM OPINION[*]

v.       Record No. 2120-07-2                           PER CURIAM
                                             FEBRUARY 12, 2008

PETERSBURG DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
Pamela S. Baskervill, Judge

(John G. LaFratta, on brief), for appellant.

(Joan M. O'Donnell; J. Wicker Traylor, Guardian *ad litem* for the
infant child, on brief), for appellee.


Dawn Branch (hereinafter "mother") contends the trial court erred in terminating her

parental rights to her minor child, K.L.  Mother argues the trial court erred by finding the

evidence sufficient to terminate her parental rights and to approve the goal of adoption.  For the

reasons stated herein, we summarily affirm the trial court's decision.  Rule 5A:27.

Background

We view the evidence[1] in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The facts are drawn from the Statement of Facts filed with the trial court in lieu of a
transcript pursuant to Rule 5A:8.  The parties stipulated to the evidence offered by the Petersburg
Department of Social Services ("PDSS") in its case-in-chief, and mother conceded the evidence
was sufficient to make out a prima facie case warranting termination of her parental rights.

K.L. was born on October 25, 2006.  Because she was born prematurely, she weighed only one pound and required intensive medical support, including frequent feedings and an apnea monitor.  K.L. remained in the hospital until February 20, 2007.  She continued to require an apnea monitor upon her discharge and remained on the monitor at the time of the termination hearing on August 6, 2007.

Shortly before K.L.'s release from the hospital, PDSS received a report that mother was unable to administer the child's medication properly even though it had been "color-coded." Mother could not operate the apnea monitor and, on one occasion, had failed to recognize K.L. was in respiratory distress.

K.L. was placed in foster care pursuant to an emergency removal order on February 20, 2007.  A few weeks later, the juvenile and domestic relations district court ruled that K.L. was an abused child and approved the goal of adoption.  Mother appealed to the circuit court.

Much of the evidence presented by PDSS at the termination hearing related to mother's parenting history with K.L.'s older sibling, D.L.  Mother's parental rights to D.L. were terminated in 2006.  Like K.L., the older child was born prematurely and required support such as frequent feedings and use of an apnea monitor.  D.L. remained in the hospital nearly three months after her birth.  Prior to her discharge, hospital staff provided mother with intensive training to care for the older child, including proper use of the apnea monitor.

While D.L. was in the hospital, mother failed to respond to the alarm of the apnea monitor on at least two occasions and appeared incapable of caring for the older child on a daily basis. PDSS met with mother to determine her ability to care for the older child and requested a psychological evaluation to determine what services, if any, were available to assist or enhance mother's ability to care for D.L.

The psychological evaluation was completed on July 20, 2005 by Dr. Greg Wolber. Mother's overall scores on intelligence tests administered by Dr. Wolber bordered on mental retardation and revealed her incapable of performing simple multiplication and division computations. Dr. Wolber concluded mother would "likely have difficulty with more complex aspects of daily living, i.e., handling a budget, planning meals and shopping for groceries, providing the correct medication, mixing formula, etc." Dr. Wolber acknowledged she would likely be able to perform "some of these tasks" with supervision. If mother were to retain custody of her child, Dr. Wolber recommended an "intense level of supervision not only to train her in appropriate childcare but also to continue to monitor and assess her ability to parent."

In addition to training at the hospital and parenting classes, PDSS employee Gail Davis-Lee provided in-home supervised visitation and individual parenting instruction upon D.L.'s release from the hospital in August 2005. Davis-Lee provided this instruction to mother twice a week for fourteen months, but observed little improvement in mother's parenting skills. Based upon her observations, Davis-Lee did not believe the older child could be left safely in mother's sole care.

On or about October 4, 2006, mother's parental rights to the older child were terminated pursuant to Code § 16.1-283(C)(2). The juvenile court found that mother suffered from a "combination of intellectual, cognitive, and psychiatric difficulties" which required the older child's continued placement in foster care and which available rehabilitative services could not eliminate.

Mother countered the evidence regarding her capacity to parent K.L. with expert testimony from Dr. Penny L. Sprecher. Dr. Sprecher testified that mother was not mentally retarded and was able to function at the level of an eighteen year old. However, Dr. Sprecher's report indicates that mother's scores on the intelligence tests administered to her "resulted in

Verbal, Performance and Full Scale scores within the [m]ild range of Mental Retardation."

Dr. Sprecher, whose report attributes mother's poor test scores to anxiety, concludes that mother

"is probably functioning in the [b]orderline range of intelligence."

While Dr. Sprecher's report concluded that mother was "capable of caring for her self

[sic] and . . . her young children," she admitted at the termination hearing her conclusions were

based upon information provided by mother and her friend, Vicki Parham. Dr. Sprecher also

acknowledged she had no information about the medical needs of mother's child and that she

had not visited mother's home or observed mother caring for any children.

Vicki Parham testified that she visited mother four or five days each week and assisted

her with her finances. Parham was the payee on the mother's disability checks and paid

mother's rent and utilities bills with those funds. She stated that she transported mother to visit

K.L. in the hospital several times and was willing to assist mother in caring for K.L. Parham

admitted, however, she had applied for financial aid for K.L. after the child was placed in foster

care, and produced three checks which were confiscated by the trial court.

Mother testified she was capable of caring for K.L. and knew how to use the apnea

monitor from instruction she had received at the hospital. She indicated she had been employed

at a fast-food restaurant, but had left that job to care for her children.

In addition to the evidence stipulated in its case-in-chief, PDSS proffered testimony from

Davis-Lee that K.L. had been placed in the same foster home where her sister resided, and PDSS

had no plans to move her. PDSS proffered through Davis-Lee that K.L. was happy and

well-adjusted, but had medical needs which were more serious and required more intensive care

than those of her older sister.

The trial court concluded that "[b]oth children were placed in foster care due to the

mother's inability to comprehend their needs and to follow instructions for their care." This

instruction included "training at MCV Hospital and Chippenham Hospital, parenting classes, individual parenting instruction and a psychological evaluation to determine her level of functioning." The trial court noted that "mother d[id] not maintain employment or independent housing," and relied on social security income for disability. Finally, the trial court found that "mother ha[d] a combination of intellectual, cognitive and psychiatric difficulties which require[d] the child's continued placement in foster care and which available rehabilitative services [could] not eliminate."

The trial court's order found that termination was warranted under subsections (B)(2)(a), (C)(2), and (E) of Code § 16.1-283. This appeal followed.

## Analysis

"Code § 16.1-283 embodies 'the statutory scheme for the . . . termination of residual parental rights in this Commonwealth' [which] . . . 'provides detailed procedures designed to protect the rights of the parents and their child,' balancing their interests while seeking to preserve the family." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995) (citations omitted). The trial judge's findings, "'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." Id. "'[T]ermination of [residual] parental rights is a grave, drastic, and irreversible action.'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of the City of Richmond, 231 Va. 272, 280, 343 S.E.2d 70, 72 (1986)). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory

requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990).

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of mother's residual parental rights to K.L. on three alternative grounds. Without specifically referring to any of these sections, mother argues the trial court erred in terminating her parental rights because the evidence did not support its finding that she had mental limitations which could not be overcome. Specifically, mother contends the trial court erred by rejecting her expert's testimony that she was capable of parenting K.L.

We need not address whether the trial court erred in deciding termination was warranted under subsection (B)(2)(a), i.e., that mother's mental condition rendered her incapable of providing the necessary care to K.L, because the record supports the trial court's decision on subsection (E) grounds. Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Subsection (E) of Code § 16.1-283 provides as follows:

> The residual parental rights of a parent or parents of a child who is in the custody of a local board or licensed child-placing agency may be terminated by the court if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that (i) the residual parental rights of the parent regarding a sibling of the child have previously been involuntarily terminated . . . .

The evidence is undisputed that mother's parental rights to her older child were terminated in October 2006. However, mother maintains the evidence did not support the trial court's finding that termination was in K.L.'s best interests. We disagree.

- 6 -

Despite extensive training and prior experience with her first child, mother demonstrated an inability to operate K.L.'s apnea monitor and administer her medications properly. Through Davis-Lee, PDSS established that fourteen months of individual training had little effect on mother's ability to address her first child's needs. Davis-Lee's observations were corroborated by mother's subsequent failure to recognize that K.L. was in respiratory distress and by her inability to administer her child's medications properly. K.L., who has more demanding medical needs than those of the sister with whom she is placed, is "happy and well-adjusted in her placement."

The record contains credible evidence to support the trial court's finding that termination is in the best interests of K.L. and that the requirements of Code § 16.1-283(E)[2] have been proven. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

Affirmed.

---

[2] As subsection (E) does not impose an obligation on PDSS to provide services, we also reject mother's argument that PDSS failed to fulfill its obligation to provide all reasonable, appropriate, and available services to perpetuate the parent-child relationship.