COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Senior Judge Annunziata


ANGEL LEE PARKS

                                                    MEMORANDUM OPINION[*]
v.       Record No. 2039-07-3                            PER CURIAM
                                                       AUGUST 26, 2008
WYTHE COUNTY DEPARTMENT
  OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF WYTHE COUNTY
                       Josiah T. Showalter, Jr., Judge

          (R. Christopher Munique; Melissa S. Carrico, Guardian *ad litem* for
          Angel Lee Parks; Randy Jones, Guardian *ad litem* for minor child;
          Lacy, Campbell & Munique, P.C.; Carrico Law, P.C., on brief), for
          appellant.

          (S. Vernon Priddy III; Michael R. Bedsaul; Sands Anderson
          Marks & Miller, P.C., on brief), for appellee.


        Angel Lee Parks (mother) appeals a decision of the trial court terminating her residual

parental rights to her minor child, N.P.  She contends the evidence was insufficient to support the

termination under Code § 16.1-283(B) and 16.1-283(C)(2).  Upon reviewing the record and the

parties' briefs, we conclude this appeal is without merit.  Accordingly, we summarily affirm the trial

court's decision.  See Rule 5A:27.

        As the parties are familiar with the facts of this case, and this opinion has no value as

precedent, we dispense with a discussion of the facts generally.  The parts of the record

necessary to explain this opinion are incorporated below.[1]

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] No transcript of the trial court proceeding was filed in this case.  Rather, the facts are
reflected in the exhibits and orders in the record and the Agreed Written Statement of Facts,

On July 26, 2007, the trial court issued a letter opinion setting forth its basis for ruling that Wythe County Department of Social Services (DSS) met its burden of proof under Code § 16.1-283 to support termination of mother's residual parental rights to N.P. On October 24, 2007, the trial court entered an order for involuntary termination of [mother's] residual parental rights under Code § 16.1-283(B) and 16.1-283(C)(2). Mother appealed to this Court.

The trial court heard extensive testimony, considered numerous exhibits, and considered written closing arguments submitted by all parties, before it issued its July 26, 2007 letter opinion approving the permanent plan of adoption and terminating mother's residual parental rights to N.P. In ruling that DSS proved by clear and convincing evidence that the best interest of N.P. is to have mother's parental rights terminated, the trial court found the testimony and evidence of the expert clinical psychologists, Drs. Daniel B. Porter and Gary A. Wishart, who evaluated mother and reviewed various records, to be "compelling and credible." The trial court did not find their opinions conflicted, noting Dr. Porter prepared his report several months before Dr. Wishart examined mother, and that both experts diagnosed mother with "extreme mental illness that affects her ability to care for [N.P.]." The trial court pointed out that Dr. Porter recommended "until such time as [mother] accepted and addressed her mental illness, she could not be considered an appropriate or healthy psychological caretaker for [N.P.]." The trial court also relied on Dr. Wishart's opinions, specifically the following opinion:

> Ms. Parks could never make the changes in her life that would be necessary for her to become a reasonably safe person to parent her infant child. It would be a disservice to not only the child but to Ms. Parks as well to put her in the position of trying to parent her child. She has been in a chronic state of emotional overload throughout life as she has tried to take care of herself, and she would likely become more stressed, perhaps to the point of something tragic happening, if she were trying to raise a child in addition to taking care of herself.

Testimony and Other Incidents of the Case signed by all parties and approved by the trial court on April 24, 2008.

Mother's argument on appeal focuses on her contention that the expert opinions of Drs. Porter and Wishart conflicted and, therefore, DSS failed to sustain its burden to prove mother suffered from a "mental or emotional illness of such severity that there is no reasonable expectation that she could undertake responsibility" for N.P.'s care. In light of the purported expert psychologists' conflicting opinions, mother also contends DSS failed to sustain its statutory burden by clear and convincing evidence. Mother further argues the evidence failed to prove she had been unwilling or unable to remedy substantially the conditions, which led to N.P.'s placement and continuation in foster care, despite DSS's reasonable and appropriate efforts. Mother points out that DSS terminated attempts to reunite her and N.P. less than five months after N.P. came into foster care on May 13, 2005, and mother relies upon evidence presented on her behalf showing the efforts and progress she made to remedy the conditions which led to N.P.'s foster care placement and to comply with Dr. Porter's recommendations.

> When reviewing a decision to terminate parental rights, we presume the circuit court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" In its capacity as factfinder, therefore, the circuit court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests."

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (citations omitted). However,

> [b]ecause "the rights of parents may not be lightly severed," clear and convincing evidence must establish the statutory grounds for termination. In the end, the "child's best interests" remain the "paramount consideration" of the court. Even on this issue, however, we cannot "substitute our judgment" for the circuit court's, but rather review the record only to determine if sufficient evidence supports it.

Id. at 266, 616 S.E.2d at 770 (citations omitted).

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of mother's residual parental rights to N.P. on alternative grounds, i.e., under subsections (B) and (C)(2) of Code § 16.1-283.

Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Code § 16.1-283(B) provides in its pertinent part that the residual parental rights of a parent of a child found by the court to be neglected or abused and placed in foster care as a result of court commitment[2] may be terminated if clear and convincing evidence proves that it is in the best interests of the child and that:

> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.
>
> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> a. The parent . . . [is] suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development . . . .

---

[2] Mother does not dispute that N.P. was found to be abused and neglected and placed in foster care as a result of court commitment upon her removal from mother's care on May 13, 2005. Furthermore, the permanency planning order entered by the trial court on October 24, 2007 reflects that legal custody of N.P. was with DSS and that custody was transferred or placement of N.P. occurred on May 13, 2005, as a result of "a court order in abuse and neglect case."

Furthermore, we have held that "Code § 16.1-283(B) requires only that the circuit court consider whether rehabilitation services, if any, have been provided to a parent. Nothing in Code § 16.1-283 or the larger statutory scheme requires that such services be provided in all cases as a prerequisite to termination under subsection B." Toms, 46 Va. App. at 268, 616 S.E.2d at 771.

Here, the factual record contains credible evidence to support the trial court's decision to terminate mother's residual parental rights to N.P., and to support a finding that DSS proved by clear and convincing evidence the requirements necessary for termination under Code § 16.1-283(B).

"[V]iew[ing] the evidence in the light most favorable to [DSS,] the prevailing party below[,] and grant[ing] to it all reasonable inferences fairly deducible therefrom, see Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991), it established that upon N.P.'s birth, she tested positive for barbiturates, and mother expressed a desire to kill the child if it was a boy. At that time, DSS removed N.P. from mother's care due to her mental instability and history of failing to comply with treatment. As a part of that proceeding, Dr. Porter evaluated mother and diagnosed her as suffering from multiple mental illnesses, including Attention Deficit Disorder, Bipolar Disorder, Type II, depressed, Schizoaffective Disorder, Mixed Personality Disorder, with explosive, dependent, and avoidant traits, Serial Abuse Victim, Adult Child of Alcoholic Parent, and Non-Compliance with Medical Treatment. While Dr. Porter acknowledged mother appeared to be "relatively stable," he noted that by history "there are clear indications of severe psychopathology." He opined that mother needed intensive psychiatric services and appropriate medications taken on a consistent basis, and recognized that mother was at high risk of relapse. He stated that absent the provision of such services over a period of time, during which mother demonstrated acceptance of care and stability, she could not be considered an appropriate or healthy psychological caretaker for her

child. Finally, he opined that mother was in denial regarding the severity of her emotional conditions and her need for psychiatric mental health care, and recommended that she not be considered for child guardianship until she addressed the issues mentioned in his report.

N.P. was removed from mother's care a second time in May 2005, after having only been in her care for approximately two and one-half months, when mother exhibited paranoid and incoherent thoughts, and was then involuntarily committed. The testimony of Fran Anders, Annette Stamper, and Rhoda Thomas established mother's lack of cooperation with services offered to her both before and after N.P. was removed from mother's care in May 2005, mother's inability to parent and effectively care for N.P. despite efforts by DSS and others, and the lack of any bond between N.P. and mother. Ultimately, in September 2005, in-home services ceased due to Dr. Wishart's report and mother's mental instability and lack of cooperation, which prevented her from benefiting from those services.

Pursuant to court order, Dr. Gary Wishart performed a second psychological evaluation of mother on August 16, 2005. Dr. Wishart acknowledged that he did not observe mother with N.P. However, he reviewed mother's available medical records and mental health records, performed standardized tests on mother, and interviewed mother, Anders, and Stamper. Wishart met with mother over a period of seven to eight hours on one occasion, which is considered an intensive evaluation in his profession. Dr. Wishart believed he spent sufficient time with mother and obtained sufficient information in order to allow him to form a valid and reliable evaluation of her.

Dr. Wishart testified that mother was thirty-one years old at the time of his evaluation. He testified about mother's psychiatric history, which included psychiatric hospitalizations at age ten and between ages fifteen and eighteen, one in Massachusetts and one in Indiana, following severe physical abuse by her father. Dr. Wishart noted several other psychiatric hospitalizations,

including a two and one-half-year hospitalization from December 1997 to June 2000, from the ages of twenty-three to twenty-five. The records indicated that mother had placed three children, who were relatives, in a freezer, which resulted in that lengthy hospitalization. Upon her discharge from that hospitalization, mother was diagnosed with Schizoaffective Disorder, Bi-Polar Type, and a history of Intermittent Explosive Disorder and being a victim of physical and sexual abuse. Dr. Wishart noted that after coming to this area, mother had undergone two hospitalizations.

Dr. Wishart diagnosed mother as suffering from Schizoaffective Disorder, Bi-Polar Type, Borderline Intellectual Functioning, and Personality Disorder, NOS (including features of Paranoid, Schizotypal, Anti-social, Borderline, and Narcissistic Personality Disorders). He testified that mother has a poor ability to "think in rational and controlled fashion, and to perceive situations around [her] in an accurate way"; she "lacks considerably" in the ability to effectively deal with "stressful thoughts and feelings"; she has a "poor understanding of herself as well as others which make it difficult for her to benefit from teaching, example, or intervention"; her "overall intelligence falls in the Borderline Mentally Retarded range"; and she "lacks the psychological resources necessary for adequate bonding and effective interaction with another, which would seriously affect an infant and its psychological development." Dr. Wishart opined that mother is too disturbed psychologically and lacks the socio-emotional skills necessary to parent a child effectively. He opined that it is "possible for [her] condition to worsen over time while it is unlikely it will improve much over time." He further stated that mother's "poor self-control of emotions including anger outbursts" has "implications for her ability to tolerate and effectively address challenging behavior from her child as it gets older."

Dr. Wishart's August 16, 2005 report and his testimony in the trial court, which the fact finder was entitled to accept, reflected the extent of mother's severe mental illness and

intellectual deficits, and their impact on her ability to parent and care for N.P., as well as her poor prognosis for stability and improvement in the future. Dr. Wishart ultimately opined that mother "could never make the changes" in her life that would be necessary for her to become a reasonably safe person to parent her child and that it would be a "disservice to not only the child but to [mother] as well" to put her in the position of trying to parent her child. He also stated that mother had been in a "chronic state of emotional overload throughout life as she has tried to take care of herself, and she would likely become more stressed, perhaps to the point of something tragic happening, if she were trying to raise a child in addition to taking care of herself." Dr. Wishart gave all his opinions to a reasonable degree of probability in the field of psychology.

Based upon this record, we conclude that DSS proved by clear and convincing evidence that termination of mother's parental rights is in N.P.'s best interest and that "[i]t is not reasonably likely that the conditions which resulted in [N.P's] neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to [mother] within a reasonable period of time." Code § 16.1-283(B)(2). DSS's evidence clearly and convincingly proved that mother is "suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that [she] will be able to undertake responsibility for the care needed by [N.P.] in accordance with [her] age and stage of development." Code § 16.1-283(B)(2)(a). Furthermore, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." [3] Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

---

[3] Since N.P.'s birth on January 5, 2005, she has been in mother's care for only approximately two and one-half months, ending when mother was involuntarily committed on May 13, 2005. At the time of the circuit court hearing on October 19, 2006, N.P. had been in foster care for the second time in her short life for approximately seventeen months, and for almost twenty months, when the hearing was completed on January 5, 2007.

In addition, we find no merit in mother's contention that the fact that DSS ceased providing her services as of September 27, 2005, necessitated against termination of her parental rights. To the contrary, there is no requirement that DSS provide rehabilitative services to a parent with respect to termination under Code § 16.1-283(B), only that the trial court consider such services, if any were provided, before the child's initial placement into foster care. See Toms, 46 Va. App. at 268, 616 S.E.2d at 771; Code § 16.1-283(B). Here, the trial court considered extensive testimony regarding the efforts made by DSS and others to rehabilitate mother both before and after N.P. was placed in foster care in May 2005.

In summary, clear and convincing evidence proved termination of mother's residual parental rights was in N.P.'s best interest, and DSS satisfied the statutory requirements of Code § 16.1-283(B) necessary to support such termination. Having found the trial court's decision terminating mother's parental rights under Code § 16.1-283(B) was not plainly wrong or without evidence to support it, we need not consider the sufficiency of the evidence to support termination under Code § 16.1-283(C)(2).

For these reasons, we summarily affirm the trial court's decision.

Affirmed.